**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

―――――――――――――――――――――――――

|                        |   |
|------------------------|---|
| DONATUS U. DURU,       | ) |
|                        | ) |
| Plaintiff,             | ) |
| v.                     | ) |
|                        | ) |
| DISTRICT OF COLUMBIA,  | ) Civil Action No. 15-664 (EGS) |
|                        | ) |
|                        | ) |
| Defendant.             | ) |

―――――――――――――――――――――――――

<u>**MEMORANDUM OPINION**</u>

**I. Introduction**

Plaintiff Donatus Duru ("Mr. Duru") brings suit against
Defendant District of Columbia ("District" or "D.C.") after he
was terminated from his position as a Youth Development
Representative ("YDR") at New Beginnings Youth Development
Center. Mr. Duru alleges that his national origin (Nigerian)
motivated the District's decision to terminate him, in violation
of Title VII of the Civil Rights Act of 1964 ("Title VII"), as
amended, 42 U.S.C. §2000(e), *et seq.;* the District of Columbia
Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq.;* and
the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section
1981"). He requests compensatory damages and expenses, in
addition to other equitable relief including ordering the
District to institute anti-discrimination policies and
procedures and Equal Employment Opportunity Commission ("EEOC")

1

supervisory training. Pending before the Court is the District's motion for summary judgment. *See* Def.'s Mot., ECF No. 25. The Court has carefully considered the motion, the response and reply thereto, the applicable law, and the entire record herein. The Court finds that there is no genuine dispute as to any material fact, and thus, for the reasons stated below, the District's motion for summary judgment is **GRANTED.**

## II. Background

Except where indicated, the following facts are not in dispute. Mr. Duru was born in Nigeria. Pl.'s Opp'n, ECF No. 39 at 1. In 1983, he moved to the United States and became an American citizen in 1992. Pl.'s Dep., ECF No. 39-4 at 23:20–24:22. That same year, he began working for the D.C. Department of Youth Rehabilitation Services ("DYRS") as a YDR. He served as a YDR for almost thirty years until he was terminated in 2012. *Id.* at 25:21-26:4.

The DYRS is a D.C. agency that is "responsible for the supervision, custody, and care of [detained] young people charged with a delinquent act in the District . . . ." DYRS Executive Summ., ECF No. 25-1. YDRs are responsible for the "rehabilitation, direct supervision and active positive engagement, and safety and security of youth in the custody of DYRS." Position Description, ECF No. 25-1 at Ex. 2. A YDR is expected to adhere to the "eyes-on-supervision policy," which

requires that a YDR "maintains ongoing visual contact with all youth under supervision." Policy #8-9.3, ECF No. 25-1 at Ex. 5. An YDR can only be removed for cause. Such causes include neglect of duty, insubordination, incompetence, misfeasance, and other employment-related reasons for which adverse action is not arbitrary or capricious. D.C. Personnel Regulations §§ 1603.2, 1603.3, ECF No. 25-1 at Ex. 3. In determining which, if any, adverse action is warranted for a specific policy violation, DYRS utilizes "progressive discipline," in which imposed punishments become harsher as the severity of the infraction and/or number of offenses increases. Table of Appropriate Penalties, ECF No. 25-1 at Ex. 4. In "administering progressive disciplinary action," "only the past three years' [of] prior discipline can be used against an employee. . . ." Test. of HR Specialist Ohler ("Ohler Test."), ECF No. 39-7 at 142: 9-14.

### A. Mr. Duru's Disciplinary History

While Mr. Duru contests the veracity of each documented violation and whether the discipline imposed for each violation was appropriate, it is uncontested that Mr. Duru was disciplined for five separate incidents in the three years prior to his termination. Pl.'s Opp'n, ECF No. 39 at 12-13 (not denying his discipline record despite denying other statements within the same paragraph); *see generally id.* at 29-30 (explaining previous violations); Pl.'s Dep., ECF No. 39-4 (explaining each

3

violation). First, in September 2009, Mr. Duru received a
counseling notice for failing to report to his work post in a
timely manner. Pl.'s Opp'n, ECF No. 39 at 29. In his deposition,
Mr. Duru could not recall this incident. Pl.'s Dep., ECF No. 39-
4 at 98:17-100:8. Second, in October 2009, Mr. Duru received a
three day suspension for sleeping on the job. Pl.'s Opp'n., ECF
No. 39 at 29. Mr. Duru contends that this charge was fabricated.
*Id*. Third, in March 2010, Mr. Duru received a nine-day
suspension, for unauthorized absence without official leave. *Id*.
Mr. Duru contends that this charge was not warranted because he
had contracted malaria while visiting Nigeria and was banned
from traveling back to the United States.[1] *Id.* at 29-30. Fourth,
on December 13, 2011, Mr. Duru received a fifteen-day suspension
for violating DYRS' "eyes-on-supervision" policy. Pl.'s Opp'n.,
ECF No. 39 at 12-13 (not denying his discipline record despite
denying other statements within the same paragraph). Finally, on
December 15, 2011, Mr. Duru was terminated for violating DYRS'
"eyes-on-supervision" policy again. *Id.* The final two
disciplinary events, occurring on December 13, 2011 and December
15, 2011, are explained more fully below. Mr. Duru's termination

---

[1] As a result of the nine-day suspension, Mr. Duru filed a
complaint with the EEOC for national origin discrimination.
Pl.'s Dep., ECF No. 39-4 at 69:19-71:21. The EEOC ultimately
found that Mr. Duru had been subject to unfair treatment, but
that DYRS had not engaged in discrimination. *Id*.

became effective on June 26, 2012. *See* Resp. to Proposed
Termination, ECF No. 25-1 at Ex. 16; Hearing Findings, ECF No.
25-1 at Ex. 15.

### B. The December 13, 2011 Incident

On December 13, 2011, a "serious incident" occurred while
Mr. Duru and another YDR, Ms. Jacqueline Brown, were on duty.
Pl.'s Opp'n., ECF No. 39 at 8, ¶ 11. Specifically, four DYRS
youth residents entered the bathroom at the same time and
climbed into the ceiling, contrary to DYRS policy. *Id.* ¶ 12. As
a result, several residents required medical attention and the
ceiling was damaged. *Id.* at 9, ¶¶ 17, 18. DYRS conducted an
investigation and prepared an incident report. *See* Dec. 13
Incident Report, ECF. No 25-1 at Ex. 7. Both Ms. Brown and Mr.
Duru were charged with violating DYRS' "eyes-on-supervision"
policy and with neglect of duty, insubordination, and
incompetence. Notice of Suspension, ECF No. 25-1 at Ex.6; Notice
to YDR Brown, ECF No. 25-1 at Ex. 9. Mr. Duru received a
fifteen-day suspension and Ms. Brown received an official
reprimand. *Id.*

### C. The December 15, 2011 Incident

Two days later, on December 15, 2011, another "major
incident" occurred while Ms. Brown and Mr. Duru were again on
duty, along with a third YDR, Mr. Jeffrey Starkey. Pl.'s Opp'n.,
ECF No. 39 at 10, ¶ 21. Adopting Mr. Duru's version of events,

two youth residents assaulted a resident. Pl.'s Opp'n, ECF No. 39 at 2-4. While Mr. Duru was breaking up that fight, two different residents used a dissembled broom to assault another resident. *Id.* at 3. At least one resident was taken to the hospital to treat his injuries. *Id.;* OEA Decision, ECF No. 39-8. DYRS again conducted an investigation and prepared an incident report with witness statements. Dec. 15 Incident Report, ECF Nos. 25-1 at Exs. 12, 13.

Both Ms. Brown and Mr. Duru were again charged with violating DYRS' "eyes-on-supervision policy" and with neglect of duty, insubordination, incompetence, and misfeasance. Notice of Proposed Removal, ECF No. 25-1 at Ex. 11; Notice on Suspension, ECF No. 25-1 at Ex. 14. Mr. Duru, but not Ms. Brown, was also charged with negatively affecting the integrity of the government. *Id.* Ms. Brown and Mr. Duru were again disciplined-Mr. Duru was fired and Ms. Brown was suspended for nine days. *Id.* YDR Starkey was not disciplined for the incident. Pl.'s Opp'n, ECF No. 39 at 34. In an affidavit, YDR Starkey states that he had been on an approved break at the time of the incident, while Mr. Duru argues that he had not been approved to leave his station. Starkey Aff., ECF No. 25-1 at Ex. 18; Pl.'s Opp'n, ECF No. 39 at 10-11, ¶ 23.

### D. Mr. Duru's Termination

Mr. Duru was fired after the December 15, 2011 incident. Notice of Proposed Removal, ECF No. 25-1 at Ex. 11. DYRS decided to fire Mr. Duru after reviewing his disciplinary history and conducting investigations of the two "serious" December 2011 incidents. Ohler Test., ECF No. 39-7 at 144:20-145:13; Hearing Officer Findings, ECF No. 25-1 at Ex. 15 ("With each transgression, his sanctions increase and his suitability to remain in the position of a [YDR] is further called into question. The basis for this proposed removal has been met.").

Mr. Duru's removal was eventually overturned when Office of Employee Appeals ("OEA") Judge Dohnji found that DYRS had not met its burden of proof. OEA Decision, ECF No. 39-8 at 14. Specifically, DYRS did not present sufficient evidence that Mr. Duru violated the "eyes-on-supervision" policy on December 15, 2011. *Id.* OEA Judge Dohnji found that Mr. Duru had not violated the policy because he had been resolving the first assault when the second assault occurred. *Id.* Additionally, DYRS failed to prove that Mr. Duru was at fault for not detecting the dissembled broom used in the second assault. *Id.* at 13-14. On July 16, 2014, Mr. Duru was reinstated and reimbursed for back-pay, benefits lost, and attorney's fees. *Id.* at 14.

Mr. Duru previously filed a charge of national origin discrimination with the EEOC, which was cross-filed with the D.C. Office of Human Rights. Pl. Opp'n, ECF No. 39 at 15, ¶ 28.

## III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the nonmoving party must demonstrate that there is a genuine issue of material fact. *Id.* at 324. A material fact is one that is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, in the summary judgment analysis "[t]he evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV. Analysis

To establish a viable national origin claim under Title VII, the DCHRA, and Section 1981,[2] Mr. Duru must provide sufficient evidence to establish that the District's non-discriminatory justification for firing him was pretext for its real, discriminatory reason.[3] Under all three statutes, it is unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his . . . employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e-2)(a)(1). There are "two essential elements of a discrimination claim . . . (i) the plaintiff suffered an adverse employment action [and] (ii)

---

[2] It may be that Mr. Duru's claim is not cognizable under Section 1981. *See Kidane v. N.W. Airlines, Inc.*, 41 F. Supp. 2d 12, 16-17 (D.D.C. 1999)("[A] plaintiff cannot base proof of discrimination under § 1981 solely on the place or nation of his origin."). Because the Court finds that no reasonable jury could find that the District was motivated by Mr. Duru's national origin when it fired him and because neither party raises this argument, the Court will not address this issue.

[3] All three of Mr. Duru's claims under Title VII, Section 1981, and DCHRA are analyzed using the same framework and therefore will be discussed concurrently. *See Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) ("Where, as here, the plaintiff has proffered no direct evidence of intentional discrimination, race discrimination claims under both the DCHRA and Section 1981 are evaluated using the same framework as claims arising under Title VII . . . .")(citing *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1553 (D.C. Cir. 1997)).

because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

If the plaintiff succeeds in proving the prima facie case by a preponderance of the evidence, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse action]." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (internal citations and quotations omitted). The employer's burden is therefore satisfied if it "simply 'explains what [it] has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Id*. at 256 (quoting *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n. 2 (1978)). The defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id*. at 254. Moreover, "it is important to note" that although the "burden of *production* [has shifted] to the defendant, the ultimate burden of *persuading* the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotations omitted)(emphasis added).

If the defendant presents a "legitimate, nondiscriminatory" reason for the adverse action, the burden shifts again. "[T]he plaintiff must then . . . prove by a preponderance of the

10

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The plaintiff may be able to prove pretext, for example, "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 256)). However, this is not altogether sufficient: "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original).

While the prima face case "is no longer relevant" once "the defendant has succeeded in carrying its burden of production," *Hicks*, 509 U.S. at 510, it is undisputed that Mr. Duru has stated a prima facie case. *See* Def.'s Mot., ECF No. 25; Pl.'s Opp'n, ECF No. 39 at 24-25. Thus, the only question before the Court is the "central issue" of a discrimination case: whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [the employee] based on his [national origin]." *Brady v. Office of Sargeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

## A. The District Proffered a Legitimate, Non-Discriminatory Justification for its Decision to Terminate Mr. Duru

The District asserts that it terminated Mr. Duru for legitimate, non-discriminatory reasons. First, it contends that the "serious incidents" involving Mr. Duru in December 2011 and his disciplinary history warranted termination. Def.'s Stmt. of Material Facts, ECF No. 25 at 6, ¶ 24. Mr. Duru's supervisor, Superintendent Baynes, testified at the OEA hearing that the decision was ultimately influenced by "all the personnel actions" and "[the] lack of eyes-on supervision [on December 13, 2011 and December 15, 2011] . . . which could have also caused great harm to the youth." Baynes Test., ECF No. 39-6 at 50:13-22. The combination caused Superintendent Baynes to "have no confidence that [Mr. Duru] can provide the safety and security that we require within DYRS from our YDRs." *Id.* at 54:20-55:2.

It is clearly legitimate for an employer to terminate an employee after a policy violation. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297-98 (D.C. Cir. 2015)(finding it legitimate that an employee was fired for violating a safety policy); *Brady v. Office Sergeant at Arms*, 520 F.3d 490, 494-95 (D.C. Cir. 2008) (finding it legitimate that an employee was fired for violating a sexual harassment policy); *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008) (finding it legitimate that an employer took adverse action because the "disciplinary measures . . . occurred only after various

infractions" and therefore "good institutional administration"
justified discipline); *Childs-Pierce v. Util. Workers Union of
Am.*, 383 F. Supp. 2d 60, 72-73 (D.D.C. 2005) (finding it
legitimate that an employee was disciplined for violating one
policy and later terminated for not complying with another).

However, Mr. Duru argues that the District's proffered
explanation is not supported by the evidence. Pl.'s Opp'n, ECF
No. 39 at 25-32 (primarily citing his own deposition, ECF No.
39-4; the videotape of the incident, which is not included as an
exhibit; the OEA decision overturning his termination, ECF No.
39-8; and the transcript from the OEA hearing, ECF Nos. 39-6, 7,
10). Mr. Duru disagrees with the District's conclusion that he
violated DYRS policy. Specifically, he argues that he did not
violate the eyes-on-supervision policy on December 15, 2011.
Pl.'s Opp'n, ECF No. 39 at 30-31. Instead, he argues that he was
protecting DYRS residents involved in the first assault. *See,
e.g.*, Pl.'s Dep., ECF No. 39-4 at 185:1-186:6; Pl.'s Opp'n, ECF
No. 39 at 30. He also argues that he did not conduct a defective
sweep of the unit; therefore, it was not his fault that a
resident was able to access the broom used to assault another
resident. Pl.'s Opp'n, ECF No. 39 at 27-28. He ultimately
concludes that the District's description of the two December
2011 incidents was "exaggerated," that his disciplinary history
was the result of violations that did not actually occur, and

that the progressive discipline imposed was inappropriate under the circumstances. *Id.* at 30.

The District's decision may be legitimate and non-discriminatory even if it was based on conclusions that ultimately prove to be factually inaccurate, so long as it "*honestly and reasonably believed* that the underlying . . . incident occurred". *Brady*, 520 F.3d at 496 (emphasis in original). Because the District articulated a non-discriminatory explanation for its action, "the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" *See Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)(quoting *McCoy v. WGN Cont'l Broad. Co.,* 957 F.2d 368, 373 (7th Cir. 1992)). Moreover, the Court should not "second-guess" the employer's explanation for its actions "absent [a] demonstratively discriminatory motive." *Id.* at 1183 (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982) and citing *Pignato v. Am. Trans. Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.")).

Mr. Duru has not raised an issue of material fact as to whether the District honestly believed his termination was

warranted. The District's decision to terminate Mr. Duru was reached after the undisputedly "serious incident" that occurred on December 15, 2011, his fifth infraction in three years. *See, e.g.*, Baynes Test., ECF No. 39-6 at 43:4-21. While Mr. Duru argues that some of his infractions were not warranted, he has not produced any evidence to question that there were five infractions in his personnel record. Pl.'s Opp'n., ECF No. 39 at 12-13, ¶ 25 (not denying his discipline record despite denying other statements within the same paragraph). Moreover, he correcting admits that this Court is not the forum for relitigating the merits of his prior disciplinary actions. Pl.'s Opp'n, ECF No. 39 at 29-30. It is therefore reasonable that a DYRS official reviewing Mr. Duru's file would see his extensive disciplinary history and honestly rely on that information in concluding to terminate him.

As in *Burley*, "the fact that [the District's] conclusion was not the *only* possible conclusion does not cast doubt on the sincerity of its belief." 33 F. Supp. 3d 61, 70 (D.D.C. 2014) (emphasis in original). The District's termination decision was not made hastily. It was made only after DYRS officials conducted two investigations of the December 2011 incidents, reviewed the written statements of all witnesses, watched the security videotapes from the custodial area, and examined Mr. Duru's personnel file. Baynes Test., ECF No. 39-6 at 30:22-31:3;

43:7-21; *see* Incident Reports, ECF No. 25-1 at Exs. 7, 12, 13. Because this course of action involved the "steps one would expect of an investigator who sincerely sought to determine what actually happened," it is easy to conclude that the District honestly believed that Mr. Duru was responsible for the December 2011 incidents and had violated DYRS policy five times in three years. *Burley*, 801 F.3d at 299.

Even if Mr. Duru is correct that he did not violate DYRS policy and that his disciplinary history was unwarranted, he must still provide evidence that his national origin motivated DYRS' decision to terminate him; the law "protects against discriminatory decisions, not wrong ones." *Hairsine v. James*, 517 F. Supp. 2d 301, 308-09 (D.D.C. 2007); *see Burley*, 801 F.3d. at 298 ("[Plaintiff's] analysis of the record falls short of identifying grounds on which a factfinder reasonably could conclude that [the employer's] stated rationale for disciplining him was a pretext for . . . discrimination."). Fully crediting Mr. Duru's only evidence of the District's discriminatory motivation—his own deposition testimony—he has not raised a disputed issue of fact as to whether he was fired as a result of his national origin.

**B. Mr. Duru Failed to Establish that the District's Legitimate Reason for Terminating Him was Mere Pretext for National Origin Discrimination**

The Court must determine, viewing the evidence in the light most favorable to Mr. Duru, whether a reasonable jury could believe that the District's proffered reason was not genuine, but simply pretext for discrimination. Mr. Duru makes two arguments. First, he reasserts that he never violated DYRS policy, contending that the District "created an entire scenario to defend against its discrimination . . . ." Pl.'s Opp'n, ECF No. 39 at 28. Second, Mr. Duru claims the District treated him more harshly than it did similarly situated, American-born YDRs. *Id.* at 34-39. Neither argument is availing.

**1. Mr. Duru Failed to Establish that the District Did Not Honestly Believe that His Termination Was Warranted**

Because the District Court may not "second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive," the Court must determine whether a jury could believe that DYRS' justification was disingenuous or dishonest. *Fischbach*, 86 F.3d at 1183. To that end, the Court may infer that the defendant had a discriminatory motive if "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495; *see also Burley*, 33 F. Supp. 3d at 69 (concluding that "no reasonable jury could infer [defendant] is lying about

17

its reasons for disciplining [the plaintiff]"). Whether the District's decision was incorrect is therefore "relevant" if its error was "too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183.

In Mr. Duru's case, there is no basis in the record to suggest that DYRS fabricated the facts surrounding his termination, nor does the record establish that any mistake made was so obvious as to be intentional. To the contrary, the record establishes that DYRS took the incidents seriously and conducted an investigation before terminating Mr. Duru. *See, e.g.*, Incident Reports, ECF No. 25-1 at Exs. 7, 12, 13. Mr. Duru does not criticize those investigations as flawed or unfair. *See* Pl.'s Opp'n, ECF No. 39; *compare with Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006) (concluding that a jury could infer discriminatory pretext when the investigation leading to the employee's termination was "not just flawed but inexplicably unfair").

There is no basis in the record to find that the District "created the entire scenario," as Mr. Duru claims. Pl.'s Opp'n, ECF No. 39 at 28. Contrary to this conclusory allegation, it is undisputed that Mr. Duru was on duty when youth residents in his care were severely injured. *Id.* at 8, ¶ 11, 10, ¶ 21. Moreover, he ultimately *admits* that he should have been disciplined for the December 2011 incidents—he begrudges that he was fired while

other YDRs were not: "all the three of us [YDRs] that work in that unit [were] supposed to be disciplined [for the December 15, 2011 incident]." Pl.'s Dep., ECF No. 39-4 at 181:21-182:3. While OEA Judge Dohnji reversed the District's decision to terminate Mr. Duru, she never suggested that the District fabricated the charges against him or was obviously mistaken that the events occurred. *See* OEA Decision, ECF No. 39-8. Instead, Judge Dohnji found that the District had not met its statutory burden to prove that Mr. Duru's actions warranted termination. *See id.* at 10-13. Ultimately, because the District's belief at the time was "reasonable in light of the evidence," there is "no basis for permitting a jury to conclude that the employer is lying . . . ." *Brady*, 520 F.3d at 495.

### 2. Mr. Duru Failed to Establish that the District Favored Similarly Situated, American-born Employees

Mr. Duru argues that the District disciplined him more harshly than it did similarly situated, American-born employees who committed comparable infractions. He concludes that this disparate treatment reveals a discriminatory motive. Pl.'s Opp'n, ECF No. 39 at 34-39. A plaintiff can establish "pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race [or national origin] . . . more favorably in the same factual circumstances.'" *Burley*, 801 F.3d at 301

(quoting *Brady,* 520 F.3d at 495). In order to reach this conclusion, the Court must first determine, based on evidence substantiated by the record, that the plaintiff and an asserted comparator are "similarly situated." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015). A plaintiff and a comparator may be similarly situated if they are "charged with offenses of comparable seriousness" and their "employment situation[s] [are] nearly identical." *Burley*, 801 F.3d at 301 (citations omitted). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," but the court may find that employees are not similarly situated as a matter of law if a reasonable jury would be unable to reach that conclusion. *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005)(citations omitted).

Mr. Duru argues that the District engaged in national origin discrimination because he was treated more harshly than two similarly situated, American-born YDRs: Ms. Brown and Mr. Starkey. Pl.'s Opp'n, ECF No. 39 at 34-39. The Court only evaluates whether Ms. Brown is a proper comparator because Mr. Duru puts forward no evidence regarding Mr. Starkey's employment

history or disciplinary record. *See generally* Pl.'s Opp'n, ECF No. 39. Therefore, the Court cannot assess whether Mr. Duru and Mr. Starkey are similarly situated.

Mr. Duru argues that the District discriminated against him because: (1) Ms. Brown received lesser penalties for the same conduct; and (2) DYRS did not record all of her alleged past disciplinary infractions. *Id.* The Court cannot infer that the District favored American-born Ms. Brown because Mr. Duru has not raised an issue of material fact such that a reasonable jury could find that they were similarly situated. Indeed, it is undisputed that Ms. Brown and Mr. Duru had the same job and same responsibilities. *Id.* at 30-39. In fact, Ms. Brown was on duty with Mr. Duru and was jointly responsible for the December 13, 2011 and December 15, 2011 incidents. *Id.* at 8, ¶ 11 and 10, ¶ 21. It is also true that Ms. Brown received less severe discipline than Mr. Duru for those two incidents: a formal reprimand for the December 13, 2011 incident and a nine-day suspension for December 15, 2011 incident. *Id.* at 34. However, the Court finds that Ms. Brown and Mr. Duru are not similarly situated as a matter of law because Mr. Duru has not established that their "employment situations" were "nearly identical." *Burley*, 801 F.3d at 301.

Ms. Brown and Mr. Duru had different disciplinary histories, which constitutes "differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them." *Ey v. Office of Chief Administrative Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 345 (D.D.C. 2013)(quotations and citations omitted)). Indeed, a disciplinary history is a "relevant factor" in determining whether employees are similarly situated. *Childs-Pierce v. Util. Workers Union of America*, 383 F. Supp. 2d 60, 75 (D.D.C. 2005) (citations omitted); *see also Kidane v. N.W. Airlines, Inc.,* 41 F. Supp. 2d 12, 17-18 n. 8 (D.D.C. 1999). In *Childs-Pierce*, the plaintiff was not similarly situated to other employees because she "possessed a record of misconduct" while the comparator employees did not. 383 F. Supp. 2d at 74. So here too. Whereas Mr. Duru had a total of five infractions over three years, Ms. Brown only had two infractions over the same three years. *See* Ohler Test., ECF No. 39-7 at 161:16-162:13; *see also* Def.'s Answers to Interrog., ECF No. 39-41 at 9 ("The District of Columbia employs a progressive discipline scheme. [Ms.] Brown did not have a disciplinary history that would warrant removal, in contrast to Plaintiff's disciplinary history."). For this reason, Ms. Brown and Mr. Duru are not similarly situated and their respective treatment does not raise an inference of intentional discrimination.

Just as in *Childs-Pierce*, the District had a "legitimate reason" to doubt Mr. Duru's fitness as an YDR. 383 F. Supp. 2d

at 74. It is clear from the record that their respective disciplinary histories caused the District to fire Mr. Duru and merely suspend Ms. Brown. For example, when asked in the OEA proceeding why Ms. Brown was suspended but Mr. Duru was terminated, Ms. Ohler testified that "Mr. Duru had more disciplinary actions in the prior three years than Ms. Brown had." Ohler Test., ECF No. 39-7 at 161:6-9. Had Ms. Brown's discipline history been similar to Mr. Duru's, she also would have been terminated. *Id.* at 162:5-19.

Mr. Duru attempts to refute this explanation with his second argument: Ms. Brown was unfairly favored because she had two infractions that the District did not record. By recording his conduct but not recording her "prior egregious conduct," Mr. Duru argues that Ms. Brown *is* a proper comparator *and* the District engaged in national origin discrimination by favoring her. *Id.* at 38. If Ms. Brown's true violations had been recorded, "the number of disciplinary actions in her personnel folder would be equal to Mr. Duru's," warranting identical treatment. Pl.'s Opp'n, ECF No. 39 at 37-38.

The first of two allegedly unrecorded infractions occurred in "November or December 2010"[4] when "some residents blocked the

---

[4] Mr. Duru alleges this unrecorded incident happened in "November or December 2010" on pages 14 and 37 of his opposition memorandum and "November/December 2009" on page 36. Pl.'s Opp'n, ECF No. 39. While the date does not affect the Court's analysis,

bathroom door with chairs and climbed through the ceiling to escape." *Id.* at 37. According to Mr. Duru, Ms. Brown was "not reprimanded for this incident at all, in direct conflict with DYRS' progressive discipline structure." *Id.* However, Mr. Duru offers no evidence other than his own testimony to demonstrate that this unrecorded incident occurred. *Turner v. Shinseki*, 824 F. Supp. 2d 99, 118 (D.D.C. 2011) ("When considering a summary judgment motion the Court need not rely on any conclusory allegations unsupported by factual evidence.")(quotations and citations omitted). Mr. Duru also fails to provide any evidence that DYRS knew about Ms. Brown's infraction and chose not to discipline her. *See Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 33 (D.D.C. 2008) ("Of course, Plaintiff cannot claim that management disparately disciplined other [employees] unless he shows that management was aware of those [employees'] alleged infractions.").

At various points in his brief, Mr. Duru supports his contention that an unrecorded violation occurred in November or December 2010 by citing to the Defendant's Responses to the Plaintiff's Request for Admissions ("RFA"), ECF No. 39-10 ¶¶ 6 and 8, and to his own deposition, ECF No. 39-4. *See* Pl.'s Opp'n, ECF No. 39 at 13-14, 34-39. However, none of the cited record

---

it will that assume that the first allegedly unrecorded incident occurred in November or December 2010.

supports the stated proposition. Specifically, in the cited RFA, the District specifically denies that "[Ms.] Brown was working on a shift . . . in November and/or December 2010 [when] some residents blocked the door with chairs (or other items) and climbed through the ceiling." ECF No. 39-10 ¶¶ 5, 6. While the District admits that Ms. Brown "was not disciplined for the incident . . . in Admission No. 6," the District clearly denied that the event listed in "Admission No. 6" had occurred. *Id.* ¶ 8. Thus, the District merely admitted that Ms. Brown was not disciplined for an event that it denied happened in the first place. *Id.* This clearly does not support Mr. Duru's allegation of the unrecorded violation.

Furthermore, although he cites his deposition, Mr. Duru did not testify about the alleged unrecorded incident whatsoever. *See* Pl.'s Dep., ECF No. 39-4. Instead, he corroborated the District when he stated that Ms. Brown had only one "prior incident" before December 13, 2011—the alleged December 12, 2011 incident discussed below. *Id.* at 142:5-7. When asked if Ms. Brown had any other infractions, Mr. Duru said he "had no idea." *Id.* at 143:21-144:3. His testimony therefore contradicts his own allegations. As in *Burley*, "despite the opportunity . . . to develop the point" by, for example, deposing Ms. Brown, "the record is devoid of even a circumstantial basis" from which the

Court could infer that this unrecorded event happened and that the District knew but chose not to act. 301 F.3d at 299.

The second allegedly unrecorded violation occurred on December 12, 2011, the day before the December 13, 2011 incident involving Ms. Brown and Mr. Duru. According to Mr. Duru, Ms. Brown was on duty when residents "locked her out of the bathroom and climbed through the ceiling."[5] Pl.'s Opp'n, ECF No. 39 at 14. Mr. Duru states that he learned about this alleged infraction because he "read the log book . . . ." Pl.'s Dep., ECF No. 39-4 at 142:5-144:3. Beyond his own testimony, however, Mr. Duru does not offer any support in the record that this second unrecorded incident occurred. See Fields v. Office of Johnson, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."). Mr. Duru cites to the "log book," from which he learned about the incident.[6] Pl.'s Opp'n, ECF No. 39 at 14. However, the Court reviewed the entire record and was unable to locate a log book or testimony that corroborates Mr. Duru's

[5] In the OEA hearing, however, Mr. Duru alleges that the youths got "into the ceiling by stacking tables in the main dorm area." Ohler Test., ECF No. 39-13 at 194:7-13.

[6] Mr. Duru's exhibit list, ECF No. 40, identifies the log book as exhibit 8. However, there is no exhibit 8 on the docket. In his opposition, he identifies the log book as exhibit 7. See Pl.'s Opp'n, ECF No. 29 at 14. Exhibit 7 is listed as video surveillance, which also does not exist.

account. Moreover, at the OEA hearing Superintendent Baynes testified that while DYRS maintains a log book, he did not recall seeing any entry regarding Ms. Brown's alleged December 12, 2011 infraction. Baynes Test., ECF No. 39-6 at 79:5-80:21.

Mr. Duru also relies on Ms. Ohler's OEA testimony, frequently citing it for the proposition that "Brown had a disciplinary infraction on December 12, 2011, although [Ohler] seems to not be aware that Brown also had a disciplinary action on December 13, 2011." *See, e.g.*, Pl.'s Opp'n, ECF No. 39 at 14, 33, 36, 39. The Court disagrees that Ms. Ohler was aware of a third, unrecorded infraction. After carefully reading the entire hearing transcript, it is clear that Mr. Duru mischaracterizes Ms. Ohler's testimony. Making all inferences in Mr. Duru's favor, Ms. Ohler was obviously confused about the dates of the two December 2011 incidents. For example, Mr. Duru's counsel begins questioning Ms. Ohler about the allegedly unrecorded December 12, 2011 incident by asking whether Ms. Ohler was "aware of whether Ms. Brown, the day before this incident, had been involved in an incident . . . . were you aware of any event on December 12th involving Ms. Brown?" Ohler Test., ECF No. 39-7 at 162:20-163:3. However, just before this question was asked, Ms. Ohler was testifying about the December 15, 2011 incident— not, as the convoluted question suggests, the December 13, 2011 incident. *Id.* at 160-162.

Moreover in the same line of questioning, Ms. Ohler testifies that Ms. Brown received an "official reprimand" for the alleged December 12, 2011 incident—the discipline that she actually received for the December 13, 2011 incident. *Id.* at 163:9-14. When Mr. Duru's counsel asked whether management knew about the allegedly unrecorded December 12, 2011 incident, Ms. Ohler testified that management knew about the incident involving "both employees" on "the first date." *Id.* 170:16-171:9. Accepting Mr. Duru's arguments, Ms. Ohler was referring to the December 13, 2011 incident because the allegedly unrecorded December 12, 2011 event involved only Ms. Brown.

This conclusion becomes all the more clear once Ms. Ohler realized that Mr. Duru's counsel was asking her about a third infraction:

> Counsel: Do you have an understanding that Ms. Brown had an event on December 12 of 2011 that was in her [personnel] folder?
>
> Ohler: Yes
>
> Counsel: How about December 13 of 2011?
>
> Ohler: I don't know that one.
>
> Counsel: Wasn't Ms. Brown on duty with Mr. Duru when the youths went through the ceiling in the restroom?
>
> Ohler: That's the thing that I was referring to.
>
> Counsel: What thing?
>
> Ohler: All I knew for Ms. Brown was the event where the youths got in the ceiling and this

> event for which we're here today, whatever those dates are.
>
> Counsel: . . . Were you aware of an event where youths got into the ceiling through the main floor on December the 12th of 2011 by stacking tables?
>
> Ohler: I'm sorry . . . are you telling me there's three events in three days? . . . I know of two events in the December time frame.

Ohler Test., ECF No. 39-13[7] at 193:4-194:6.

Despite her confusion, Ms. Ohler continually maintained that Ms. Brown had "no other instances in her file within the past three years." Ohler Test., ECF No. 39-7 at 172: 12-19. Therefore, her OEA testimony does not raise a factual dispute as to whether Ms. Brown had a third, unrecorded infraction known to DYRS. To use this obvious misunderstanding to support the proposition that Ms. Brown had three known infractions is misleading. Furthermore, Ms. Ohler's testimony that Ms. Brown only had two known infractions is corroborated by Arnita Evans, another DYRS HR Specialist. *See* Evans Dep., ECF No. 39-5. At her deposition, Ms. Evans testified that there were only two infractions in Ms. Brown's personnel folder—both from the December 13, 2011 and December 15, 2011 incidents. *Id.* at 51:10-15. When specifically asked whether there was an additional

---

[7] Mr. Duru attached Ms. Ohler's OEA administrative hearing testimony as separate exhibits. However, this testimony is from the same hearing.

event in December 2011, Ms. Evans testified that she was not aware of another incident. *Id.* at 68:21-69:2; 90:3-15.

With only Mr. Duru's unsubstantiated allegations that Ms. Brown committed unreported infractions, he fails to establish that he was similarly situated to Ms. Brown. Ultimately, no reasonable jury could conclude that the District was motivated to fire him based on his national origin.

## V. Conclusion

Drawing every justifiable inference in Mr. Duru's favor, as the Court must, it finds no basis upon which a reasonable factfinder could conclude that the District was motivated by Mr. Duru's national origin when it terminated him. *See Celotex*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ."). Accordingly, the District's motion for summary judgment is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:** **Emmet G. Sullivan**
**United States District Judge**
**April 9, 2018**